[COMMENT1] 

 

 

 

 

 

                                      COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-04-413-CR

 

 

LOUIS EARL GOODMAN                                                       APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.      Introduction

A jury convicted Appellant
Louis Earl Goodman of manslaughter and assessed his punishment at eighteen
years= confinement.  In three issues,
Appellant contends:  (1) the trial court
erred by failing to submit the lesser included offense of criminally negligent
homicide to the jury; (2) a fatal variance exists between the indictment and
the proof at trial; and (3) the evidence is insufficient to support his
conviction.  We affirm.








II.     Background








On November 25, 2003,
Appellant, Ted Garland, Henry Quinten Clay, and Shawn Davis were working the
evening shift on a gas drilling rig in Denton County, Texas.  Appellant, as the driller, was in charge of
the crew that evening because Lonnie Lavergne, the Atool pusher,@ was not at
the site.  At about 8:00 p.m., Clay went
into the top doghouse[1]
where Appellant, Garland, and Davis were sitting around and talking.  At some point, the conversation turned to
initiating Davis since he was a new member of the crew.[2]  Several initiation techniques were mentioned,
including hoisting Davis up with either the Acat line@ or the Aboom line.@  A Acat line@ consists of
a rope, a cable, and a chain with a hook on it. 
One end of the rope is wrapped around the cathead for traction, and the
other end of the rope is attached to the cable that runs through a shiv on the
derrick.  The cable is then attached to
the chain, which is wrapped around whatever needs to be lifted.  Generally, a cat line is used to pick up pipe
and put it in the Amousehole@ on the rig floor.[3]  

After Clay had gone
downstairs, Appellant and Garland suggested to Davis that they put a derrick
belt on him.  A derrick belt is a belt or
harness that a crew member wears to help him climb the derrick.  In the front of the belt are two AD-rings,@ or pieces
of metal woven into the belt, where a chain attaches. Davis replied that he did
not want to put a belt on and that they would have to put it on him.  The three men wrestled, and Appellant and
Garland succeeded in putting the belt on Davis. 
Appellant then retrieved the cat line. 









Clay was making his way back
up the stairs when he saw Appellant walking into the top doghouse with the
chain end of the cat line.  Clay
testified that he began shaking his head because he thought that Awasn=t very
smart.@ He stated that the kelly, the device located on the rig floor that is
used to drill into the ground and rotates at seventy rounds per minute, was
turning and, based on his experience, he knew that any slack in the cat line
could get caught on the kelly as it turned. 
Clay saw the end of the cat line going up the backside of the derrick,
indicating that it either had slack in it and the weight of the chain on the
cable was pulling it up or that it had gotten caught in something.  Clay then saw that the chain part of the cat
line was tight and was being pulled in reverse out of the top doghouse;
therefore, he knew that the cat line was wrapping around the kelly. 

Meanwhile, inside of the top
doghouse, Appellant hooked the cat line onto the belt Davis was wearing and
said, AI got you.@  Without taking his hand off the cat line,
Appellant immediately tried to unhook it. 
However, Appellant stated that he felt something start to pull the cat
line, and he was unable to unhook the cat line as it pulled Davis out of the
door of the top doghouse. 

Clay saw Davis being dragged,
face first, out of the building.  Clay
testified that Davis hit the bottom half of the doghouse door, taking it off
the hinges.  Davis was then dragged to
the kelly bushing where he was spun around approximately ten to twenty times as
his body hit several different pieces of equipment and surfaces.  Clay testified that Davis was getting beaten
to death; therefore, he yelled for Appellant so that Appellant would shut down
the equipment.  Appellant shut down the
rotary table, and Clay Akicked the
pumps out@ to stop the
rotary table from spinning backwards.  








Appellant, Garland, and Clay
checked on Davis.  Appellant tried to use
the company rig phone to call 911, but the phone would not work.  Clay went to his truck, called 911 on his
cell phone, and drove to a convenience store to meet the ambulance.  While Clay was gone, Appellant removed the
belt from Davis and hung it back up in the top doghouse.  Clay returned to the rig with the
ambulance.  The paramedics checked Davis
for a pulse, but he was dead. 

While they waited for the
police officers to arrive, Appellant, Garland, and Clay talked about what had
happened.  Clay testified that Appellant
wanted him to tell the police officers that the cat line had come loose from a
pipe, that Davis was then showing the cat line to Appellant, and that Davis
accidentally got too close to the kelly, causing the cat line to wrap around
it.  When Troy Mac Hohenberger, the fire
chief for the Argyle Fire District and a paramedic, arrived on the scene,
Appellant told him this story five or six times.  Additionally, when Appellant spoke with
Deputy David Brawner that night about how Davis had died, he told Deputy
Brawner a similar story. 








In Clay=s written statement that he gave to the police that night, he simply
wrote down what he had seenCthat he had seen Davis getting wrapped up in the kelly.  He testified that he did not put everything
in the statement because Garland was standing right behind him when he wrote
it.  The following morning, however, Clay
called Investigator Don Britt of the Denton County Sheriff=s Office.  Investigator Britt
testified that based on his conversation with Clay that morning, he was no
longer looking at the incident as an accident.  


After obtaining the owner=s permission to go back out to the drilling rig, Investigator Britt,
Investigator Larry Kish, and Lieutenant Terry Kimbell returned to the
scene.  They collected several belts that
were hanging on a hook inside the top doghouse. 
Investigator Britt also located both halves of the top doghouse door
that had been taken off the doghouse and placed behind a shed.  Investigator Britt noticed that on one of the
door halves, the hinge was bent off and there was blood on it.  Carolyn Van Winkle, a senior DNA analyst with
the Tarrant County Medical Examiner=s Office, later testified that the blood on the belt was a Apositive match@ to Davis=s blood and that it was Ahighly likely@ that the
blood on the door was Davis=s blood. 








While the officers were
investigating at the drilling rig, Appellant arrived for work.  Investigator Britt asked Appellant to come to
the sheriff=s office
with him so that he could interview Appellant about what happened.  Appellant agreed to do so.  When they first arrived at Investigator Britt=s office, Appellant related the same story to Investigator Britt that
he had told the law enforcement officers on the previous night.  Investigator Britt told Appellant that they
had reason to believe the incident happened differently than Appellant=s story.  Appellant then gave
the following statement, which Investigator Britt typed as Appellant related
the facts to him:

All four of us was in the dog
house talking about Thanksgiving:  me,
Quintin, Ted and Shawn.  Quintin left,
down onto the ground, to do some work. 
The three of us was sitting in there drinking coke and coffe [sic],
talking.

Ted said something about
initiating Shawn.  He was the new hand on
the crew.  It is something that normally
happens with the new guy.  I said we were
too far away from the pits.  Normally we
would throw someone in the pit for initiation. 
We said we would put the derrick belt on Shawn.  Me and Ted put it on him.  We wrestled around, getting it on him.  We sat around for about 15-20 minutes
afterward, smoking cigarettes.

I said I would just hook a
chain on him.  Then Ted said, ANo,
grab the catline.@  The catline is a cable that picks up pipe and
puts it in the mouse hole.  It was
outside.  I brung it through the
door.  I hooked it on Shawn, on the
derrick belt.  As I reached down to take
it off, it was too late.  The cat line
got wrapped around the kelly.  It is a
bushing that is always turning.  It drug
both of us out the door.

Shawn was pulled through the
door.  I run over and started kicking
everything out of gear.  It stopped.  I rolled him over and tried to get all the
cable off to see if I could help him.  I
tried to dial 9-11 but it wouldn=t work.  Quintin ran down and got his phone and dialed
911.

I took the belt off him,
trying to help him.[4]


 

III.     Lesser
Included Offense








In his first
issue, Appellant contends that the trial court erred by failing to submit the
lesser included offense of criminally negligent homicide to the jury.  We disagree.

We use a
two-pronged test to determine whether a defendant is entitled to an instruction
on a lesser included offense.  Rousseau
v. State, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), cert. denied,
510 U.S. 919 (1993); Royster v. State, 622 S.W.2d 442, 446 (Tex. Crim.
App. 1981).  First, the lesser included
offense must be included within the proof necessary to establish the offense
charged.  Salinas v. State, 163
S.W.3d 734, 741 (Tex. Crim. App. 2005); Rousseau, 855 S.W.2d at 672-73; Royster,
622 S.W.2d at 446.  This means that the
offense must come within the dictates of article 37.09 of the Texas Code of
Criminal Procedure.  Tex. Code Crim. Proc. Ann. art. 37.09
(Vernon 1981); Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).  AAn offense is a lesser included offense if . . . it differs from the
offense charged only in the respect that a less culpable mental state suffices
to establish its commission.@  Tex. Code Crim. Proc. Ann. art. 37.09(3).








Second, some
evidence must exist in the record that would permit a jury to rationally find
that if Appellant is guilty, he is guilty only of the lesser offense.  Salinas, 163 S.W.3d at 741; Rousseau,
855 S.W.2d at 672-73; Royster, 622 S.W.2d at 446.  The evidence must be evaluated in the context
of the entire record.  Moore, 969
S.W.2d at 8.  There must be some evidence
from which a rational jury could acquit the defendant of the greater offense
while convicting him of the lesser included offense.  Id. 
The court may not consider whether the evidence is credible,
controverted, or in conflict with other evidence.  Id. 
If there is evidence from any source that negates or refutes the element
establishing the greater offense, or if the evidence is so weak that it is
subject to more than one reasonable inference regarding the aggravating
element, the jury should be charged on the lesser included offense.  See Schweinle v. State, 915 S.W.2d 17,
19 (Tex. Crim. App. 1996); Saunders v. State, 840 S.W.2d 390, 391-92
(Tex. Crim. App. 1992).

The State
does not challenge Appellant=s contention that criminally negligent homicide is a lesser included offense
of manslaughter.  See Stadt v. State,
182 S.W.3d 360, 364 (Tex. Crim. App. 2005); Aliff v. State, 627 S.W.2d
166, 171 (Tex. Crim. App. 1982).  The
issue here is whether there is some evidence in the record that would permit a
jury to rationally find that if Appellant is guilty, he is guilty only of the
lesser included offense of criminally negligent homicide. 

A person
commits manslaughter if he recklessly causes the death of another.  Tex.
Penal Code Ann. ' 19.04(a)
(Vernon 2003).  Under Texas Penal Code
section 6.03(c),








[a] person acts recklessly, or is reckless, with respect to circumstances
surrounding his conduct or the result of his conduct when he is aware of but
consciously disregards a substantial and unjustifiable risk that the
circumstances exist or the result will occur. 
The risk must be of such a nature and degree that its disregard
constitutes a gross deviation from the standard of care that an ordinary person
would exercise under all the circumstances as viewed from the actor=s
standpoint.

 

Id. ' 6.03(c).  A person commits
criminally negligent homicide if he causes the death of another by criminal
negligence.  Id. ' 19.05(a).  Under Texas Penal
Code section 6.03(d),

[a] person acts with criminal negligence, or is criminally negligent,
with respect to circumstances surrounding his conduct or the result of his
conduct when he ought to be aware of a substantial and unjustifiable risk that
the circumstances exist or the result will occur.  The risk must be of such a nature and degree
that the failure to perceive it constitutes a gross deviation from the standard
of care that an ordinary person would exercise under all the circumstances as
viewed from the actor=s
standpoint.

 

Id. ' 6.03(d). 








The
difference between criminally negligent homicide and manslaughter is the
culpable mental state.  Stadt, 182
S.W.3d at 364; Aliff, 627 S.W.2d at 171; Lewis v. State, 529
S.W.2d 550, 553 (Tex. Crim. App. 1975). 
The offense of manslaughter Ainvolves conscious risk creation, that is, the actor is aware of the
risk surrounding his conduct or the results thereof, but consciously disregards
it.@  Stadt, 182 S.W.3d at
364 (quoting Lewis, 529 S.W.2d at 553). 
On the other hand, the offense of criminally negligent homicide Ainvolves inattentive risk creation, that is, the actor ought to be
aware of the risk surrounding his conduct or the results thereof [but fails] to
perceive the risk.@  Id. (quoting Lewis, 529 S.W.2d
at 553).  Therefore, before a charge on
criminally negligent homicide is required, the record must contain evidence
showing an unawareness of the risk.  Mendieta
v. State, 706 S.W.2d 651, 653 (Tex. Crim. App. 1986); Licon v. State,
99 S.W.3d 918, 928 (Tex. App.CEl Paso 2003, no pet.); Ybarra v. State, 890 S.W.2d 98, 111
(Tex. App.CSan Antonio
1994, pet. ref=d).        

Here,
Appellant supports his contention that he acted with criminal negligence by
pointing us to evidence showing that he was unaware that the cat line had
tangled when he hooked it to Davis.  The
dissent likewise focuses on this evidence. 
However, even accepting that fact as true, it does not raise an issue of
unawareness of the risk.  








We cannot
ignore that Appellant testified that he was the supervisor of the crew of four
men that evening and had worked on drilling rigs for approximately twenty-five
years.  Appellant stated that he began
working in the oil field as soon as he was old enough, age eighteen, and had
continued to work in the oil field ever since. 
Through those years, he had worked as a roustabout, a floor hand, a
derrick hand, and a chain hand while working his way up to the position of
driller.  Furthermore, during
cross-examination, Appellant testified as follows:

Q.  In fact, people have gotten
hurt on drilling rigs, haven=t they?

 

A.  Yes, sir.

 

Q.  I mean, people have gotten
seriously injured, haven=t
they?

 

A.  Yes, sir.

 

Q.  And some of those injuries
that you=re
aware of have involved cat lines, right?

 

A.  A couple of them.

 

Q.  So -- and you were aware of
that.  You knew about that prior to Shawn
being killed didn=t
you?

 

A.  Yes, sir.

 

Q.  So you knew that cat lines
were risky business.

 

A.  Yes, sir.

 

Q.  You knew that they were
dangerous enough that someone could get seriously hurt.

 

A.  At -- yes, sir.

 

Q.  I mean, isn=t it
even possible -- I mean, in your mind, someone could get killed with a cat
line.  You knew that, right?

 

A.  Yes, sir.

 

Q.  I mean, cat lines, catheads,
they sometimes get, I think the phrase is, fouled up, right?

 

A.  If you wrap the rope around,
yes, sir, it can get fouled up.








Q.  And you knew that?

 

A.  Yes, sir.  But the rope never did touch it.

 

Q.  But getting fouled up, was
that a possibility?

 

A.  Not at that time.

 

Q.  It wasn=t a
possibility?

 

A.  Not at that time.

 

Q.  You=d
seen cat lines get fouled up in the past, hadn=t
you?

 

A.  Yes, sir.

 

Q.  In fact, there had been a
prior incident on that particular rig, hadn=t there?

 

A.  Yes, sir.

 

Q.  Where the cat line had
gotten tangled up while it was attached to a pipe that was suspended in the
air.

 

A.  Yes, sir.

 

Q.  And that situation was a
situation that you were well aware of going into the night that you hooked
Shawn up to that cat line.

 

A.  That was the night that --
the cat line got fouled up was when the guy was picking it up with the rope
around the head.

 

Q.  And so you knew about that.

 

A.  Yes, sir.

 

Q.  Before you put the cat line
onto Shawn.

 

A.  Yes, sir.

 








Appellant also testified that
he still had his hand on the cable after he had hooked it to Davis=s belt because he knew that it was not something he should have
done.  This testimony is evidence that
Appellant himself was aware of a risk of death involving a cat line. 








Appellant=s contention that he was entitled to a charge on the lesser-included
offense of criminally negligent homicide because he was unaware that the cat
line had tangled in this particular instance is misplaced.  The State did not bear the burden to prove
that Appellant knew the rope was actually tangling, just that Appellant was
aware of the risk.  See
Trepanier v. State, 940 S.W.2d 827, 829-30 (Tex. App.CAustin 1997, pet. ref=d) (holding evidence legally sufficient to support conviction for
manslaughter even if appellant was unaware that a bicyclist was traveling on
the shoulder of the highway); see also Miller v. State, No.
01-03-00819-CR, 2005 WL 825762, at *6 (Tex. App.CHouston [1st Dist.] Apr. 7, 2005, pet. ref=d) (not designated for publication) (holding appellant not entitled to
instruction on lesser-included offense of criminally negligent homicide
because, even though appellant was unaware that the complainant was cycling
along the shoulder of the highway, she was aware of the fact that driving along
the shoulder of the highway at a speed exceeding the posted limit was
dangerous).  In fact, as the State points
out, if Appellant had known that the cat line was tangling as he attached it to
Davis, Appellant would more likely have been charged with murder for his
actions than with manslaughter.  See Tex. Penal Code Ann. '' 6.03(b), 19.02(b)(1).

We find no
evidence in the record that would permit a jury to rationally find that
Appellant is guilty only of the lesser included offense of criminally negligent
homicide.  We hold that Appellant was not
entitled to an instruction on the lesser included offense of criminally
negligent homicide and that the trial court did not err in refusing to grant
his requested charge.  We overrule
Appellant=s first
issue.

IV.    Variance

In his
second issue, Appellant contends that the trial court erred in permitting his
conviction based on a fatal variance between the indictment and  the proof at trial because the State offered
no evidence as to the cause of death as alleged in the indictment.[5]  








A Avariance@ occurs when
there is a discrepancy between the allegations in the charging instrument and
the proof at trial.  Gollihar v. State,
46 S.W.3d 243, 246 (Tex. Crim. App. 2001). 
In a variance situation, the State has proven the defendant guilty of a
crime, but has proven its commission in a manner that varies from the
allegations in the charging instrument.  Id.  A variance between the allegations in the charging
instrument and the evidence adduced at trial is a sufficiency issue.  See id. at 247.  

However,
even when viewed as a sufficiency question, a variance claim is subject to an
additional materiality analysis which is not required under a traditional
sufficiency of the evidence review.  Id.
at 248 n.7.  Only a material variance
will render the evidence insufficient.  Id.
at 257.  A variance is material if the
charging instrument, as written, did not give the defendant adequate notice of
the charge against him or if the charging instrument, as written, subjected the
defendant to the risk of a second prosecution for the same crime.  Id.








In the
present case, Appellant contends that the State offered no evidence as to the
cause of death as alleged in the indictment, but merely offered several
possibilities, such as Ahitting the
door of the doghouse, the pipe in the mousehole, the covering of the fan gears,
the [k]elly drive shaft and others.@  The indictment alleged that
Appellant caused Davis=s death by
attaching a cable to him and causing him to be pulled by that cable through a
door and into a drill pipe drive bushing. 
At trial, Appellant admitted that he helped put a derrick belt on Davis,
that he retrieved the cat line, and that he attached the cat line to the
derrick belt.  In the statement Appellant
made to Investigator Britt, he described the cat line as a cable.  Furthermore, Clay testified that the main
part of the cat line is the cable; therefore, it would be accurate to describe
a cat line as a cable. 

In the
statement Appellant made to Investigator Britt, he stated that Appellant was
pulled through the top doghouse door by the cat line.  Moreover, both Appellant=s and Clay=s testimony
at trial revealed that Davis was dragged out of the top doghouse by the cable,
hitting the bottom half of the doghouse door and taking it off the hinges. 








Clay
testified that the entire equipment device from the pipe to the kelly to the
kelly bushing to the rotary table could accurately be described as a drill pipe
drive bushing.  Clay also stated that
Davis was dragged to the kelly bushing where he was spun around approximately
ten to twenty times as his body hit the pipe slips and the chain guard.  Dr. Marc Krouse, the medical examiner who
performed the autopsy on Davis, testified that Davis=s cause of death was blunt force injury of the head, causing a very
large depressed skull fracture with significant internal head injuries.  Dr. Krouse also stated that even though he
did not know specifically which object caused Davis=s fatal injury, the fatal injury was consistent with being pulling
into a rotating kelly bushing and being spun around the drive bushing, as
opposed to hitting the top doghouse door. 


In light of
the foregoing, we hold that no variance exists as the State presented evidence
that the offense was committed in the manner that was alleged in the
indictment.  Furthermore, even if a
variance exists, the variance was not material. 
There is no evidence in the record that Appellant was not given adequate
notice of the charge against him, nor does the indictment, as written, subject
the defendant to the risk of a second prosecution for the same crime.  Therefore, we overrule Appellant=s second issue.

V.     Sufficiency
of the Evidence

In his third
issue, Appellant contends that the evidence is insufficient to support his
conviction because the State failed to prove beyond a reasonable doubt that
Appellant acted recklessly.[6]








In reviewing
the legal sufficiency of the evidence to support a conviction, we view all the
evidence in the light most favorable to the verdict in order to determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).








The
sufficiency of the evidence should be measured by the elements of the offense
as defined by the hypothetically correct jury charge for the case.  Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Ortiz v. State, 993 S.W.2d 892, 895 (Tex. App.CFort Worth 1999, no pet.).  Such
a charge would be one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily restrict the State=s theories of liability, and adequately describes the particular
offense for which the defendant was tried. 
Gollihar, 46 S.W.3d at 253; Malik, 953 S.W.2d at 240.  The law as authorized by the indictment means
the statutory elements of the charged offense as modified by the charging
instrument.  See Curry, 30 S.W.3d
at 404.








In reviewing
the factual sufficiency of the evidence to support a conviction, we are to view
all the evidence in a neutral light, favoring neither party.  See Zuniga v. State, 144 S.W.3d 477,
481 (Tex. Crim. App. 2004).  The only
question to be answered in a factual sufficiency review is whether, considering
the evidence in a neutral light, the fact finder was rationally justified in
finding guilt beyond a reasonable doubt. 
Id. at 484.  There are two
ways evidence may be factually insufficient: 
(1) when the evidence supporting the verdict or judgment, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt;
or (2) when there is evidence both supporting and contradicting the verdict or
judgment and, weighing all of the evidence, the contrary evidence is so strong
that guilt cannot be proven beyond a reasonable doubt.  Id. at 484-85.  AThis standard acknowledges that evidence of guilt can >preponderate= in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 
 In performing a factual
sufficiency review, we are to give deference to the fact finder=s determinations, including determinations involving the credibility
and demeanor of witnesses.  Id. at
481; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  

A proper
factual sufficiency review requires an examination of all the evidence.  Id. at 484, 486-87.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s complaint
on appeal.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).








Appellant
testified that he had been working on drilling rigs for approximately
twenty-five years.  Based on his
experience, Appellant agreed that drilling rigs are dangerous, even when
everyone is doing exactly what they are supposed to be doing.  Appellant specifically testified that, prior
to Davis being killed, he knew that people had been seriously injured on
drilling rigs, that some of those injuries involved cat lines, and that it was
even possible that someone could be killed with a cat line.  In fact, both Appellant and Clay testified
about a prior incident on that particular drilling rig that occurred three to
four weeks before Davis was killed where the cat line had Afouled up@ or tangled
while it was attached to a pipe that was suspended in the air. 

Furthermore,
although Appellant contends that he was unaware that the cat line was becoming
entangled just before he hooked it onto Davis=s belt, he testified at trial that when he hooked the cat line onto
the belt, he never took his hand off it; that when he felt something start
pulling on the cat line, he immediately tried to get it undone but could not;
and when asked on cross-examination if the reason he was going to unhook it was
because he knew that having the cat line hooked to the belt was not something
he should be doing, he agreed.  Moreover,
after the incident occurred, Appellant removed the belt from Davis and hung it
back up in the top doghouse, and when law enforcement officers began arriving
at the scene, Appellant repeatedly lied about how the incident occurred.  








Finally,
Appellant, as the driller, was in charge of the crew that evening because the Atool pusher@ was not at
the site.  J.C. ABud@ Wells, a
longtime drilling contractor, testified that he thought a drill operator should
know and be aware of the risks associated with the misuse of the drilling
equipment, such as the cat line.  In
fact, Clay, who had ten to eleven years of experience working on drilling rigs,
testified that he was aware of the risks associated with drilling equipment and
because of those risks, the crew members would wear hardhats, steel-toed boots,
gloves, no jewelry, and no loose clothing. 

After
examining the evidence under the applicable legal and factual sufficiency
standards of review, we conclude that the jury was rationally justified in
finding Appellant acted recklessly. 
Therefore, we overrule Appellant=s third issue.

VI.    Conclusion

Having
overruled Appellant=s three
issues on appeal, we affirm the trial court=s judgment.

 

ANNE GARDNER

JUSTICE

 

PANEL A:   CAYCE, C.J.; GARDNER and WALKER, JJ.

 

Walker, J. filed a dissenting opinion.

 

PUBLISH

 

DELIVERED: March 30, 2006 

 

 

 

 

 

 

 

 

 

 








 

 

 

 

 

 

 

 

 




 
 
 
 
 
 
 




 

 

 

 

 

 

                                COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-413-CR

 

 

LOUIS EARL GOODMAN                                                       APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                   DISSENTING
OPINION

 

                                              ------------








I respectfully
dissent.  Because some evidence exists in
the record that would permit a jury to rationally find that if Appellant was
guilty, he is guilty only of criminally negligent homicide, I would hold that
the trial court erred by refusing to submit this lesser included offense to the
jury.  Accordingly, I would sustain
Appellant=s first
issue, reverse the trial court=s judgment, and remand this case for a new trial.

I agree with
the majority=s recitation
of the law concerning the two-pronged test we apply to determine whether a
defendant is entitled to an instruction on a lesser included offense and with
the majority=s holding
that criminally negligent homicide is a lesser included offense of
manslaughter.  See Rousseau v. State,
855 S.W.2d 666, 672-73 (Tex. Crim. App.), cert. denied, 510 U.S. 919
(1993); Royster v. State, 622 S.W.2d 442, 446 (Tex. Crim. App.
1981).  I also agree with the majority=s explanation of the legal distinction between criminally negligent
homicide and manslaughter, the culpable mental state required.  See Tex.
Penal Code Ann. ' 19.04(a)
(Vernon 2003) (defining manslaughter as recklessly causing the death of
another), ' 19.05(a)
(defining criminally negligent homicide as causing the death of another by
criminal negligence); Stadt v. State, 182 S.W.3d 360, 363-64 (Tex. Crim.
App. 2005).  I cannot agree, however,
with the majority that no evidence exists in the record that would permit a
jury to rationally find that if Appellant is guilty, he is guilty only of the
lesser offense.








The record
contains the following testimony, in addition to the testimony recited by the
majority.  Drilling rigs are inherently
dangerous.  They are dangerous even when
everyone is doing exactly what they are supposed to be doing.  The State=s expert, Mr. J.C. Bud Wells, testified that he had over forty-five
years of experience in the drilling industry in various capacities.  When asked whether it was common or uncommon
for the cat line to get Afouled up,@  Mr. Wells testified that Ait is not an everyday occurrence@ and that in his forty-five years of experience working rigs, he has
known about a half-dozen people who have been injured by the cat line. 

Mr. Wells
testified that initiations and horseplay are common on rigs and that  the participants are Anot intending to hurt anybody.@  Mr. Wells was asked what types
of things would occur if a Anew guy@ was being
initiated.  He responded,

Well, there=s a
number of things:  You know, taking a
dope brush and doping them up; blindfolding them, letting them take a
sledgehammer to hit an X and stick their hard hat under it where they hit their
hardhat with a sledgehammer; letting them walk a plank on the pit or something
and move the plank out of the way and let them fall in the pit.

 








Mr. Wells described Adoping@ as taking
the worker=s Abritches down and dope them between their legs with pipe dope.@  Appellant likewise testified
that it was common practice for new work hands to be initiated on a rig.  Appellant had initiated new workers by Agreasing their boots,@ Athrowing them
in the pits,@ and Aputting them on the cat line.@  In fact, these initiations and
Apranks@ had
likewise been done to Appellant Amany times@ during his
twenty-five years of working on rigs, and he was never injured, except for
minor Abumps and bruises.@  Appellant also testified that
he had been Apicked up a
bunch of times@ by the cat
line Ato work on things@ on the rig. 

Concerning
the incident at issue, Appellant testified that he never took his hand off of
the cat line; he hooked it on the derrick belt and attempted to immediately
unhook it.  Additionally, Appellant who
was in the top doghouse did not have the same vantage point as Clay who was on
his way up the stairs to the doghouse when Clay saw that the cat line was wrapping
around the kelly.  

Finally,
Appellant possessed only a sixth-grade education.  He cannot read or write, except to mark his
name. 

Keeping in
mind that this court cannot consider whether the above evidence is credible,
controverted, or in conflict with other evidence, the evidence recited above
refutes the intent element required for the offense of manslaughter, that is
recklessness.  See Schweinle v. State,
915 S.W.2d 17, 19 (Tex. Crim. App. 1996). 
A person acts recklessly with respect to circumstances surrounding his
conduct when 

he is aware of but consciously disregards a substantial and
unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree
that its disregard constitutes a gross deviation from the standard of care that
an ordinary person would exercise under all the circumstances as viewed from
the actor=s
standpoint.

 








Tex.
Penal Code Ann. ' 6.03(c) (Vernon 2003)(emphasis added).








Testimony
exists that Appellant himself had been hoisted on the cat line Aa bunch of times@ with only
minor bumps and bruises, thus showing that from Appellant=s standpoint, the risk of hooking the cat line to Shawn for a couple
of seconds did not constitute a substantial and unjustifiable risk that was a
gross deviation from the standard of care that an ordinary rig worker would
exercise.  Likewise, Mr. Wells=s testimonyCthat in
forty-five years he was aware of approximately six injuries from the cat lineCis evidence that Appellant=s perceived risk from hooking the cat line to Shawn=s derrick belt for a few seconds was not so substantial and
unjustifiable that its disregard would constitute a gross deviation from the
standard of care that an ordinary rig worker would exercise.  The admittedly pervasive practice on rigs of
horseplay and of initiating new workers with physical pranks also refutes the
requirement for Arecklessness@ that viewed from Appellant=s standpoint, by performing the initiation prank here, he consciously
disregarded a substantial and unjustifiable risk of Shawn=s death.  The sheer frequency of
these Apranks@ lessens
risk perception from Appellant=s standpoint.  Moreover, the
evidence showed that on the day in question, Appellant was not aware that while
he was in the top doghouse the cat line was wrapping around the kelly.  Finally, Appellant possessed a sixth-grade
education, had no training beyond sixth grade, and had worked on rigs since he
was eighteen.  Appellant was steeped in
the life and culture of working on a rig that was dangerous even when everyone
was doing his job.  Viewed from Appellant=s standpoint, not the standpoint of the judges on this court, the
above constitutes some evidence that by hooking the cat line to Shawn=s derrick belt, Appellant did not consciously disregard a substantial
and unjustifiable risk, but instead only should have been aware of the risk surrounding
his conduct but failed to perceive it.  See
Stadt, 182 S.W.3d at 364 (holding defendant entitled to instruction on
lesser included offense of criminally negligent homicide).

In my view,
the majority focuses on evidence of Appellant=s knowledge of the dangerousness of cat lines in general, instead of
determining whether evidence exists that Appellant was not, but should have
been, aware of the risk of his conduct, viewed from his standpoint, in clipping
the cat line on Shawn=s derrick
belt for a few seconds.  See Tex. Penal Code Ann. ' 6.03(d).  I cannot agree that
Appellant=s general
knowledge that cat lines are dangerous equates to a specific knowledge by
Appellant that by performing the initiation act of clipping the cat line to
Shawn=s derrick belt for a few seconds he was consciously disregarding a
substantial and unjustifiable risk that the cat line was or would become Afouled up@ or that
Shawn would be injured or killed.  See
id.

For the
reasons set forth above, I dissent. 








 

 

SUE WALKER

JUSTICE

 

DELIVERED:  March 30, 2006











[1]The Atop
doghouse@ is
an upstairs building where the drillers change their clothes and take care of
necessary paperwork. 





[2]Appellant,
Clay, and J.C. ABud@
Wells, a longtime drilling contractor, all testified that initiating new crew
members is common on drilling rigs. 
Davis had worked with the crew for approximately one week. 





[3]A Aboom
line@ is
similar to a cat line except it hangs out over the ground.  Clay testified that Appellant and Garland
suggested putting a harness on Davis and stringing him up on the boom
line.  Clay said that he thought
Appellant was joking and did not want any part of it; therefore, he decided to
go downstairs to make some rounds and check on his pumps.  Appellant, on the other hand, testified that
he and Garland suggested stringing Davis up with the cat line, not the boom
line.  Appellant also stated that Clay
had already gone downstairs when the conversation about initiating Davis began.






[4]Appellant
admitted at trial that he lied in this statement when he said that they sat
around for about fifteen to twenty minutes after putting the belt on Davis. 





[5]The
heading for Appellant=s
second issue states that the fatal variance occurred as to the proof of
jurisdiction and venue of the alleged offense; however, the substance of
Appellant=s
argument contains no such contentions. 
Because Appellant has failed to argue, cite legal authority, or make
specific record references regarding jurisdiction and venue, we overrule the
jurisdiction and venue aspect of his second issue as inadequately briefed.  Tex. R.
App. P. 38.1(h).





[6]In
his brief, Appellant refers to the motion for directed verdict that he made at
trial.  A challenge to the denial of a
motion for instructed verdict is actually a challenge to the legal sufficiency
of the evidence.  McDuff v. State,
939 S.W.2d 607, 613 (Tex. Crim. App.), cert. denied, 522 U.S. 844
(1997); Franks v. State, 90 S.W.3d 771, 789 (Tex. App.CFort
Worth 2002, no pet.).  However, because
it appears that Appellant is also challenging the factual sufficiency of the
evidence, we will address both the legal and factual sufficiency of the
evidence.















 [COMMENT1]

Majority opinion by Justice
Gardner

 

Dissent by Justice Walker